UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

ALEXANDER SOLER,                          :

        Plaintiff,                :

        vs.                      :                    No.  3:13cv1659(WIG)

CAROLYN COLVIN,                           :
Acting Commissioner of
Social Security,                          :

        Defendant.                :
----------------------------------------------------X

## RECOMMENDED RULING ON PENDING MOTIONS

Plaintiff Alexander Soler has filed this appeal of the adverse decision of the

Commissioner of Social Security denying his applications for a period of disability and disability

insurance benefits ("DIB") and supplemental security income ("SSI").  Plaintiff now moves,

pursuant to 42 U.S.C. § 405(g), for an order reversing the decision or, in the alternative, for an

order remanding the case for a rehearing.  [Doc. # 15].  Defendant has responded with a motion

to affirm the decision of the Commissioner.  [Doc. # 20].  For the reasons set forth below, the

Court recommends that the decision of the Commissioner should be affirmed.

### Procedural History

Plaintiff filed an application for DIB and SSI, claiming an onset date of November 1,

2008.  His application was denied initially and upon reconsideration.  Administrative Law Judge

("ALJ") James E. Thomas issued a decision on December 22, 2010 finding Plaintiff was not

disabled under the Social Security Act.   Plaintiff appealed to this Court.  (Case No. 3:11-cv-

842(JBA)).  On August 15, 2012, the Commissioner filed a motion for entry of judgment under

sentence four of 42 U.S.C. § 405(g) with reversal and remand of the cause to the Commissioner.

On October 18, 2012, the Social Security Administration Appeals Council issued a Remand

Order vacating ALJ Thomas's decision and remanding the case for resolution of the following:

1. Determining whether the claimant has engaged in substantial gainful activity since his alleged onset date;
2. Evaluating claimant's migraine headaches;
3. Further considering claimant's residual functional capacity ("RFC");
4. Further considering claimant's past work as a lot attendant; and
5. Obtaining supplemental evidence from a vocational expert regarding the effect of assessed limitations on claimant's occupational base.

Pursuant to the Remand Order, ALJ Thomas held a hearing on June 18, 2013. At the

hearing, Plaintiff alleged an onset date of January 31, 2008. Plaintiff, who was represented by

counsel, and a Vocational Expert testified at the hearing. On July 10, 2013, the ALJ issued a

decision concluding that Plaintiff has not been disabled from January 31, 2008 through the date

of the ALJ's decision. Plaintiff filed a request for review of the ALJ's decision; the Appeals

Council denied review, making the ALJ's decision final for appeals purposes. This appeal

ensued.

## Factual Background

Plaintiff was 45 years old at the time of the hearing before the ALJ. (R. 27). He has a

GED. (R. 27). At the time of the hearing Plaintiff was working 20 hours per week at a fast food

restaurant, where he had been employed since 2012. (R. 29). Plaintiff has prior experience

working full time at an automotive dealership as a car detailer. (R. 39). Plaintiff has a history of

affective disorder, anxiety disorder, migraine headaches, asthma, and substance abuse.

## Medical History

### A. Mental Impairments

Plaintiff went to Inter-Community Mental Health Group ("Inter") for mental health

treatment. He sought treatment because he was experiencing flashbacks and had "a lot of stuff

going on in [his] mind." (R. 513). A clinical assessment was completed on July 10, 2008

wherein Plaintiff reported depression, suicidal thoughts, and difficulty finding work other than

working at a fast food restaurant. (*Id.*). Plaintiff reported a history of being in a coma after

being attacked in a gang-related incident. (*Id.*). Plaintiff explained that his flashbacks include

trauma of being molested as a teenager. (R. 520). He further reported that he hears voices two

times per month, usually at night. (*Id.*). The assessor observed that while Plaintiff reported he

has a hard time sitting still, he did not appear restless during the interview. (R. 524). Plaintiff

was diagnosed with cannabis dependency, early full remission; depression, moderate; PTSD;

rule out Schizoeffective disorder, depressive type. (R. 525). A GAF score of 55 was recorded[1].

(*Id.*). For treatment, group and individual therapy was suggested. (R. 526-527).

     A psychiatric evaluation was conducted at Inter on August 22, 2008. Plaintiff was

diagnosed with marijuana dependency, opium abuse, depression, and posttraumatic stress

disorder "("PTSD"). (R. 426). A GAF score of 45 was assessed. (*Id.*).

     Plaintiff continued treatment at Inter. A September 12, 2008 clinical encounter note

indicates that medication was relieving Plaintiff's symptoms of anxiety. (R. 425). Plaintiff

reported feeling much better. (*Id.*). On November 11, 2008, Joan Lingard, LCSW, reported that

Plaintiff had expressed frustration with his relationship with his wife. (R. 420). She noted that

Plaintiff was seeking to improve his mood and reduce irritability so he can better manage stress.

(*Id.*). On December 2, 2008, Plaintiff's treating psychiatrist, Dr. Ahmed, noted that Plaintiff

---

[1]    GAF scores are representative of a patient's overall level of functioning. *See Diagnostic And Statistical Manual of Mental Disorders*, Fourth Edition, American Psychiatric Association, 1994 pp. 30-32. A GAF score of 21-30 is indicative of behavior that is considerably influenced by delusions or hallucinations, or serious impairments in communication or judgment. *Id.*, p. 32. A GAF score of 31-40 is indicative of some impairment in reality testing or communication, or major impairments in several areas. *Id.* A GAF score of 41-50 is indicative of serious symptoms or serious difficulty in social, occupational, or school functioning. *Id.* A GAF score of 51-60 is indicative of moderate symptoms or moderate difficulty in social, occupational, or school functioning. *See id.* at p. 32.

was non-compliant with follow up and treatment.  (R. 487).  He indicated that Plaintiff was experiencing increased stress due to an upcoming court hearing.  (*Id.*).  He also reported that Plaintiff reported thoughts of hurting himself but denied any active ideas, intent, or plan.  (*Id.*).  Dr. Ahmed further noted that Plaintiff admited hearing voices, was goal-oriented and logical, was alert and oriented, and his concentration was impaired.  (R. 488).  Plaintiff's medications were updated.  (*Id.*).

On January 7, 2009, Plaintiff's therapist at Inter, Brian Cardona, LCSW, noted that Plaintiff had difficulties with stress, substance abuse, and depression.  (R. 508).  Mr. Cardona reported that Plaintiff's living with his family was source of stress.  (*Id.*).  Plaintiff reported he was very religious and spiritual and was looking for a church to attend.  (*Id.*).  A GAF score of 45 was assessed.  (R. 509).  Recommended services included continued therapy with the aim to regulate emotions in a healthier, more appropriate manner.  (*Id.*).

On January 13, 2009, Dr. Ahmed reported that Plaintiff's medications were helping him to feel better and Plaintiff had decreased mood swings.  (R. 482).  Plaintiff was mildly depressed, goal oriented and logical, and reported mild auditory hallucinations.  (*Id.*).  A progress note signed by Dr. Ahmed on March 27, 2009 indicates that Plaintiff expressed the view that therapy was helpful.  (R. 457).  Plaintiff also reported an improved relationship with his wife.  (*Id.*).  Dr. Ahmed observed Plaintiff's mood as not depressed.  (*Id.*).   A service plan from June 10, 2009 indicates that Plaintiff had difficulty controlling his emotions and that his depression and anxiety were improved.  (R. 532).

Plaintiff was admitted to a day treatment program at The Institute of Living (the "Institute") on March 21, 2011 and was discharged on April 25, 2011.  The discharge summary indicates that Plaintiff had described increased thoughts of suicide, and increasing flashbacks of

past sexual trauma.  (R. 996).  Individual and group therapy, along with medication, was recommended.  (*Id.*).  Upon discharge, Plaintiff had improved symptoms and denied suicidal thoughts.  (R. 997).

Plaintiff continued treatment at Inter.  On January 17, 2012, Plaintiff reported to Inter he was experiencing hallucinations, that his levels of depression and anxiety had dropped, and that medication was helpful in decreasing his mood swings.  (R. 1172).  Notes from May 8, 2012 indicate that Plaintiff was keeping busy, looking for work, working through a temp agency periodically, and attending church three times per week.  (R. 1176).  Medication was helpful in decreasing Plaintiff's negative emotions.  (*Id.*).  Notes from August 31, 2012 indicate that Plaintiff had recently established stable employment and that he continued to attend church three times per week.  (R. 1180).  Medication was effective in Plaintiff's regulating his emotions. (*Id.*).

Plaintiff attended Adult Ambulatory Primary Care for crisis intervention service psychiatry on April 2, 2013.  Plaintiff had been without medication for several months because he was earning more than $400.00 per week and was no longer eligible for benefits.  (R. 1213). His mood and anxiety were in fair control.  (*Id.*).  Plaintiff returned to Adult Ambulatory Primary Care for crisis intervention service psychiatry on May 31, 2013.  His mood and anxiety were in fair control.  (*Id.*).  Plaintiff reported he was working 20 hours per week at a fast food restaurant. (*Id.*).

**B.  Physical Impairments**

On January 29, 2008, Plaintiff went to East Hartford-Manchester Community Healthcare ("East Hartford") complaining of intermittent numbness in his right hand.  (R. 370).  A Tinel's sign test was negative.  (*Id.*).  On July 1, 2008, Plaintiff went to East Hartford with complaints of

pain in his shoulder.  (R. 400).  An x-ray of the right shoulder was normal.  (R. 405).  On

October 18, 2010, Plaintiff went to Hartford Hospital with complaints of pain in his right wrist

lasting for two weeks; he reported that he can complete daily activities, but with pain.  (R. 1079).

The treating doctor opined that this could be some form of tendinitis.  (*Id.*).   A bilateral wrist x-

ray from October 6, 2011 was normal.  (R. 1085).  Institute notes from October 21, 2011 indicate

that Plaintiff had complained of pain in his wrist for three months, and that he had some relief

with Tylenol.  (R. 1055).

Plaintiff had a follow up appointment at Hartford Hospital regarding his wrist pain on

March 1, 2012.  (R. 1088).  He reported that the pain was worsening and was improved with

wrist splints, warm soaks, and Tylenol.  (R. 1088-1089).   A Hartford Hospital electromyography

test was done to address Plaintiff's complaints of bilateral hand and arm pain and numbness.  (R.

1129).  The April 4, 2012 electromyography report was normal.  (*Id.*).  Notes from a follow up

visit on August 23, 2012 indicate that Plaintiff's osteoarthritis pain in his wrist was controlled

with medication.  (R. 1139).   Hand x-rays from October 27, 2012 show no osseous or articular

abnormalities and no evidence of active inflammatory arthropathy.  (R. 1205).

Dr. Dixon from Hartford Hospital's Rheumatology Clinic issued a consultation report on

March 18, 2013.  Dr. Dixon noted that Plaintiff had a history of diffuse arthralgias mainly

involving upper extremities and numbness in both hands.  (R. 1184).  A physical exam revealed

nothing significant.  (*Id.*).  Dr. Dixon's impression was numbness and tingling in both hands with

a questionably positive Tinel sign.  (*Id.*).  A Hartford Hospital electromyography report from

April 5, 2013 noted evidence of left median neuropathy at the wrist, consistent with carpal tunnel

syndrome, very mild electrophysiologically.  (R. 1206).

Plaintiff went to East Hartford on February 28, 2008 complaining of lower back pain.  (R. 369).  He was prescribed Tylenol 500 mg.  (*Id.*)  Plaintiff went to Hartford Hospital on September 28, 2011 complaining of back pain after lifting a heavy box the day before.  (R. 1116).  He was prescribed pain medication.  (R. 1117).

On September 29, 2009, Dr. Dhaliwhal at East Hartford saw Plaintiff for his complaints of daily migraine headaches.  (R. 621).  Plaintiff was prescribed medication and an MRI was scheduled.  (R. 622).  An MRI of the brain from October 8, 2009 indicated most likely gliosis secondary to trauma, most likely small vessel disease, otherwise normal.  (R.662).  A cranial MRI from October 23, 2009 was normal.  (R. 661).  Plaintiff again complained of headaches on December 16, 2009.  (R. 650).  His medication was adjusted.  (R. 651).  On December 30, 2009, Dr. Dhaliwhal at East Hartford noted that Plaintiff's migraines responded well to propranolol. (R. 687).  On February 10, 2010, the UCONN Medical Group Neurology Associates ("Neurology Associates") recommended preventative medication for Plaintiff's migraines.  (R. 738).  Plaintiff followed up at Neurology Associates on April 14, 2010; notes from this session indicate that Plaintiff reported no relief and his medication was adjusted further.  (R. 762).

On August 1, 2011 doctors from Neurology Associates wrote a letter to Dr. Hensley at Inter noting that Plaintiff reported his migraines remain with the same frequency and intensity. (R. 1041).  The letter gives recommendations for medication changes that Plaintiff could be offered.  (*Id.*).

An MRI of Plaintiff's chest was taken on October 8, 2009 after Plaintiff complained of a cough.  (R. 664).  The results were normal with lungs clear.  (*Id.*).  Plaintiff went to Hartford Hospital for a routine follow up on March 18, 2010.  (R. 1083).  The notes indicate that his asthma symptoms were mild and he had been off medication for a month.  (*Id.*).  It was

recommended that Plaintiff step down his asthma medication.  (*Id.*).   Treatment notes from Hartford Hospital from July 1, 2010 indicate Plaintiff had a history of asthma with well controlled symptoms.  (R. 1081).  A chest x-ray from June 21, 2011 was normal with lungs clear. (R. 1085).  An EKG taken on October 27, 2012 showed normal sinus rhythm.  (R. 1202).

Finally, Plaintiff went to Hartford Hospital on October 27, 2012 complaining of chest pain.  (R. 1147).  Notes indicate his lungs sounded clear, and that duration of the symptoms coincides with drinking energy drinks.  (R. 1147-48).  Plaintiff's heart rate and respiratory system were normal.  (R. 1151).

**Agency Documents**

Plaintiff completed several Activities of Daily Living ("ADL") reports.  In the May 2, 2008 ADL, Plaintiff rated his symptoms at 9 ½ out of 10 and reported he has to limit his activities due to tiredness.  (R. 241).  In a Symptom Questionnaire from May 2, 2008, Plaintiff listed his symptoms as shoulder, back, hip, headaches, eyes.  (R. 244).  He indicated he does not need any special reminders to take care of personal grooming, and does need reminders to take medication.  (R. 245).  Plaintiff stated that he does not do house or yard work due to tiredness, and that he does not go out much because he thinks he will get in trouble with the law.  (R. 247). In the ADL from December 17, 2008, Plaintiff reported that he does need reminders to take care of his personal grooming.  (R. 257).  He indicated he shops for clothes and groceries.  (R. 260). He further reported he can walk for two miles and stop for fifteen minutes, and can pay attention for ten minutes.  (R. 262).  In the June 15, 2009 ADL, Plaintiff noted he needs special reminders to take care of personal grooming.  (R. 284).  He reported he can do a "little bit" of cleaning.  (R. 286).  Plaintiff further stated that he would need to rest every five minutes while walking, and can pay attention for five minutes.  (R. 289).  In an undated ADL, Plaintiff reported he needs

special reminders to take care of personal grooming. (R. 947). Plaintiff further stated that he does not do house or yard work because of tiredness, and can pay attention for one hour. (R. 949, 952).

A Medical Source Statement was completed by medical consultant Dr. Pathiawala on June 10, 2008. Dr. Pathiawala noted that Plaintiff complained of depression and anxiety, and reported past problems with alcohol and marijuana dependency. (R. 378). Dr. Pathiawala further noted that Plaintiff completed a GED and did fairly well. (*Id.*). Plaintiff reported being molested by a stranger when he was about 13 years old and that he still thinks about it. (*Id.*). Dr. Pathiawala observed that Plaintiff does not express any active delusional ideation and denies hallucinations; that he appeared moderately despondent and mildly anxious; that he was fairly well-oriented in all spheres; and that his attention span and concentration abilities were decreased to some extent. (R. 379). Dr. Pathiawala concluded that Plaintiff seems to present with a clinical condition suggestive of dysthymia; however, one also has to rule out the possibility of situational despondency as a differential diagnosis. (*Id.*).

Lewis Goldberg, PhD completed a Mental Residual Functional Capacity Assessment on July 1, 2008. He found Plaintiff to be moderately limited in understanding and remembering detailed instructions; carrying out detailed instructions; maintaining attention and concentration for extended periods; performing activities within a schedule, maintaining regular attendance and being punctual; and in completing a normal workday and workweek without interruptions from psychologically based symptoms and performing at a consistent pace without an unreasonable number and length of rest periods. (R. 380-381).

Dr. Kogan completed a Medical Source Statement on July 17, 2008. He indicated that Plaintiff reported a history of asthma, currently managed on medication, of almost daily

headaches, of injury to his right shoulder, and of depression.  (R. 407).  Dr. Kogan found, upon

pulmonary examination, that Plaintiff's lungs were clear to auscultation bilaterally and that there

was good air movement throughout the lung fields.  R. 409).  A neurological examination in

response to Plaintiff's report of headaches was normal.  (*Id.*).  An examination of the right

shoulder revealed no tenderness, swelling, and full range of motion.  (*Id.*).  A mental status

examination revealed Plaintiff to be alert, with good long and short term memory, and with good

concentration.  (*Id.*).

Plaintiff's counselor, Brian Cardona, completed a questionnaire on July 6, 2008.  Mr.

Cardona opined that, with respect to activities of daily living, Plaintiff had a slight problem

taking care of personal hygiene and caring for physical needs; an obvious problem using good

judgment regarding safety and dangerous circumstances and using appropriate coping skills to

meet ordinary demands of a work environment; and a serious problem handling frustration

appropriately.  (R. 505).  Regarding social interaction, Mr. Cardona opined that Plaintiff had a

slight problem respecting/responding appropriately to others in authority and an obvious problem

interacting appropriately with others in a work environment, asking questions or requesting

assistance, and getting along with others without distracting them or exhibiting behavioral

extremes.  (R. 506).  Regarding task performance, Mr. Cardona opined that Plaintiff had an

obvious problem carrying out single step instructions, focusing long enough to finish assigned

simple activities or tasks, and performing basic work activities at a reasonable pace/finishing on

time; and a serious problem carrying out multi-step instructions, changing from one simple task

to another, and performing work activity on a sustained basis.  (*Id.*).

Plaintiff's treating physician, Dr. Ahmed, completed a questionnaire on December 26,

2008.  He noted that Plaintiff had diagnoses of major depression; PTSD; and substance abuse, in

remission.  (R. 434).  With respect to Plaintiff's activities of daily living, Dr. Ahmed opined that

Plaintiff has an obvious problem taking care of personal hygiene, and caring for physical needs;

a serious problem using good judgment regarding safety and dangerous circumstances, and

handling frustration appropriately; and a very serious problem using appropriate coping skills to

meet ordinary demands of a work environment.  (R. 435).  Regarding social interaction, Dr.

Ahmed opined that Plaintiff had an obvious problem interacting appropriately with others in a

work environment and asking questions or requesting assistance; and a very serious problem

respecting/responding appropriately to others in authority and getting along with others without

distracting them or exhibiting behavioral extremes.  (R. 436).  Regarding task performance, Dr.

Ahmed opined that Plaintiff had a slight problem carrying out single step instructions; an

obvious problem changing from one simple task to another; a serious problem carrying out

multi-step instructions, focusing long enough to finish assigned simple activities or tasks, and

performing basic work activities at a reasonable pace/finishing on time; and a very serious

problem performing work activity on a sustained basis.  (*Id.*).

Mr. Cardona completed a second questionnaire on October 9, 2009.  He noted that

Plaintiff had no improvement in his condition since treatment began in July of 2008.  (R. 644).

With respect to activities of daily living, Mr. Cardona opined that Plaintiff had no problem

caring for physical needs; a slight problem taking care of personal hygiene; a serious problem

using good judgment regarding safety and dangerous circumstances and using appropriate

coping skills to meet ordinary demands of a work environment; and a very serious problem

handling frustration appropriately.  (R. 645).  Regarding social interaction, Mr. Cardona opined

that Plaintiff had a slight problem respecting/responding appropriately to others in authority; a

serious problem interacting appropriately with others in a work environment and getting along

with others without distracting them or exhibiting behavioral extremes; and a very serious

problem asking questions or requesting assistance.  (*Id.*).  With respect to task performance, Mr.

Cardona opined that Plaintiff had a slight problem focusing long enough to finish assigned

simple activities or tasks; an obvious problem changing from one simple task to another and

performing basic work activities at a reasonable pace/finishing on time; a serious problem

carrying out single step instructions and performing work activity on a sustained basis; and a

very serious problem carrying out multi-step instructions.  (*Id.*).

Mr. Cardona also completed a Mental Impairment Questionnaire on August 16, 2010.  He

commented that Plaintiff had difficulties with concentration and staying on task, and that he

continues to have difficulties with stress.  (R. 736).  Mr. Cardona opined that Plaintiff had

extreme limitations in the areas of restriction of activities of daily living, extreme difficulties in

maintaining social functioning, and marked limitations in the area of difficulties in maintaining

concentration, persistence, or pace.  (R. 737).  Mr. Cardona further opined that Plaintiff

experienced three episodes of decomposition within a twelve month period, each of a least two

weeks duration.  (*Id.*).

Ms. Janus from the Institute completed a questionnaire on April 19, 2011.  She noted that

Plaintiff's condition had slightly improvement since treatment began the previous month.  (R.

992).  Ms. Janus opined that Plaintiff had no problem caring for physical needs and using good

judgment regarding safety and dangerous circumstances, and a slight problem taking care of

personal hygiene.  (R. 994).

A Mental Residual Functional Capacity Assessment was completed by medical

consultant Dr. Leveille on May 24, 2011.  Dr. Leveille found Plaintiff had no marked limitations

in any category.  (R. 1002-1003).  Dr. Leveille opined that Plaintiff had mild limitations in the

areas of restriction of activities of daily living, mild difficulties in maintaining social functioning, and moderate limitations in difficulties in maintaining concentration, persistence, or pace.  (R. 1016).  No episodes of decomposition, each of extended duration, were found.  (*Id.*).  Dr. Leveille noted that Plaintiff's credibility was limited and that he was primarily interested in proving, by medication and recurrent doctor visits, that he is disabled.  (R. 1018).  Dr. Leveille further observed that while Plaintiff is depressed and his attention and concentration are diminished, there was no indication of a thought disorder and Plaintiff was capable of simple tasks.  (*Id.*).

Dr. Uber reviewed Plaintiff's mental health treatment on September 29, 2011 and opined that Plaintiff's major depressive disorder, PTSD, and cannabis dependence do not satisfy the Listing criteria.  (R. 1024-1032).  Dr. Uber opined that that Plaintiff had mild limitations in the areas of restriction of activities of daily living, mild difficulties in maintaining social functioning, and moderate limitations in difficulties in maintaining concentration, persistence, or pace.  (R. 1034).  No episodes of decomposition, each of extended duration, were found.  (*Id.*).  Dr. Uber noted that Plaintiff appears capable of carrying out simple work tasks reliability on a fulltime basis, and that some difficulties with concentration and depression may at times reduce optimal performance and productivity.  (R. 1038).

## Proceedings before the ALJ

At the June 18, 2013 hearing, Plaintiff testified that he has migraine headaches four to five times per day; medication was effective in treating his headaches, but because he no longer has health insurance, he has not been taking this medication.  (R. 37).  Plaintiff further testified that his asthma has gotten worse since he stopped taking medication for it.  (R. 38).  Plaintiff testified that his hands lock up on him and cause him pain.  (R. 50).  Plaintiff discussed his

history of head injury from when he was hit by a car when he was six years old and from when he was assaulted as a teenager.  (R. 47).  He reported suicidal thoughts.  (*Id.*).

Plaintiff testified about his prior work at an automotive dealership as a lot attendant.  (R. 39).  Plaintiff also testified about his current job at Wendy's where he works five days a week, four hours a day.  (R. 44).  At this job he turns on the grills, sets up equipment, does some food prep, and does some janitorial work.  (R. 44-45).  Plaintiff testified he had been working full time at Wendy's for about six months, but his hours were reduced due to the company's business practice.  (R. 49, 56).  When asked if he would be able to work more hours if they were offered, Plaintiff testified that he could not because he would be working with too many people.  (R. 56). He also testified that the managers sometimes ask him how to do something and he shows them

### The ALJ's Decision

The ALJ properly applied the established five-step, sequential evaluation test for determining whether a claimant is disabled.  20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4).  Step one determines whether the claimant is engaged in "substantial gainful activity."  If he is, disability benefits are denied.  20 C.F.R. §§ 404.1520(b), 416.920(b) (2010).  Here, the ALJ determined that Plaintiff engaged in substantial gainful activity in the fourth quarter of 2012.  (R. 11).  The ALJ reasoned that there was, however, a continuous 12-month period during which Plaintiff did not engage in substantial gainful activity, so he proceeded with the analysis.  (R. 12).

At step two, the ALJ evaluates whether the claimant has a medically severe impairment or combination of impairments.  In this case, the ALJ determined that Plaintiff has the following severe impairments: affective disorder, anxiety disorder, migraine headaches, and asthma.  (R. 12-13).

At the third step, the ALJ evaluates the claimant's impairments against the list of those impairments that the Social Security Administration acknowledges are so severe as to preclude substantial gainful activity.  20 C.F.R. §§ 404.1520(d), 416.920(d); 20 C.F.R. Part 404, Subpart P, App. 1 (2010) (hereinafter "the Listings").  If the impairments meet or medically equal one of the Listings, the claimant is conclusively presumed to be disabled.  In this case, the ALJ considered Plaintiff's physical and mental impairments, alone and in combination, and concluded that Plaintiff did not have an impairment that met or medically equaled one of the Listings.  (R. 13-15).

At step four, the ALJ must first assess the claimant's residual functional capacity ("RFC") and then determine whether the claimant can perform his past relevant work.  20 C.F.R. §§ 404.1520(f), 416.920(f).  Here, after considering the record as a whole and evaluating Plaintiff's credibility and subjective complaints of pain and other symptoms, the ALJ found that Plaintiff has the RFC to perform a full range of work at all exertion levels with the following non-exertional impairments: simple, routine, repetitive tasks with short simple instructions and few workplace changes; an attention span to perform simple work tasks for two hour intervals throughout an eight hour workday; occasional interaction with supervisors, occasional superficial interaction with coworkers, and no interaction with the public; no high paced production demands or strict adherence to timed production; no exposure to more than a moderate level of pulmonary irritants.  (R. 15).  The ALJ then determined that Plaintiff was able to perform his past relevant work as an auto detailer.  (R. 21).  At step five, the ALJ determined that there also are other jobs existing in the national economy that Plaintiff is able to perform.  (*Id.*).

Accordingly, the ALJ determined that Plaintiff has not been under a disability from January 31, 2008, through the date of his decision.

**Standard of Review**

Under 42 U.S.C. § 405(g), the district court may "enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the Commissioner of Social Security, with or without remanding the cause for a rehearing."  Judicial review of the Commissioner's decision is limited.  *Yancey v. Apfel*, 145 F.3d 106, 111 (2d Cir. 1998).  It is not the Court's function to determine de novo whether the claimant was disabled.  *See Schaal v. Apfel*, 134 F.3d 496, 501 (2d Cir. 1998).  Rather, the Court must review the record to determine first whether the correct legal standard was applied and then whether the record contains substantial evidence to support the decision of the Commissioner.  42 U.S.C. § 405(g) ("The findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive...."); *see Bubnis v. Apfel*, 150 F.3d 177, 181 (2d Cir. 1998); *Balsamo v. Chater*, 142 F.3d 75, 79 (2d Cir. 1998).

When determining whether the Commissioner's decision is supported by substantial evidence, the Court must consider the entire record, examining the evidence from both sides. *Williams v. Bowen*, 859 F.2d 255, 258 (2d Cir. 1988).  Substantial evidence need not compel the Commissioner's decision; rather substantial evidence need only be that evidence that "a reasonable mind might accept as adequate to support [the] conclusion" being challenged.  *Veino v. Barnhart*, 312 F.3d 578, 586 (2d Cir. 2002) (internal quotation marks and citations omitted). "Even where the administrative record may also adequately support contrary findings on particular issues, the ALJ's factual findings must be given conclusive effect so long as they are supported by substantial evidence."  *Genier v. Astrue*, 606 F.3d 46, 49 (2d Cir. 2010) (internal quotation marks and citation omitted).

**Discussion**

16

In this appeal, Plaintiff raises the following arguments in support of his position that a reversal and remand of the ALJ's decision is required:

(1) The ALJ failed to follow the Remand Order of this Court.

(2) The ALJ committed a number of factual errors, and made misstatements, distortions, and mischaracterizations of the evidence.

(3) The ALJ failed to properly follow the "treating physician rule."

(4) The ALJ failed to find that some of Plaintiff's illnesses and ailments are severe and failed to evaluate all of his illnesses and ailments singly and in combination.

(5) The ALJ failed to recognize that Plaintiff has a listed impairment.

(6) The ALJ did not properly determine Plaintiff's credibility.

(7) The ALJ failed to properly determine Plaintiff's RFC.

(8) The Commissioner failed to meet her burden of proof at step five of the sequential evaluation process.

## 1. This Court's Remand Order

Plaintiff argues that the ALJ failed to follow the Court's October 18, 2012 Remand Order by not adequately evaluating Plaintiff's headaches, not providing an adequate rationale for the RFC determination, and not evaluating Plaintiff's subjective complaints.  Plaintiff raises these same points in his subsequent arguments and the Court will address them therein.  In all, the Court finds that the ALJ abided by the Court's order of remand.

## 2. Alleged Factual Errors

Next, Plaintiff argues that the ALJ made factual errors, including misstating and mischaracterizing the evidence, and thus deprived Plaintiff of a full and fair hearing.

First, Plaintiff claims that the ALJ's failure to discuss his PTSD constitutes significant error because this impairment impedes his ability to perform substantial gainful activity. The Court first notes, in rejecting this argument, that Plaintiff has not cited a single piece of evidence in the record which shows that Plaintiff's PTSD causes work-related limitations. While the record does evidence Plaintiff has a *diagnosis* of PTSD, a diagnosis in itself says nothing about the severity of the impairment, or any limitations it may cause. *Burrows v. Barnhart*, No. CIV 3:03CV342 (CFD)(TPS), 2007 WL 708627, at *6 (D. Conn. Feb. 20, 2007).

Second, Plaintiff claims that the ALJ erroneously stated that Plaintiff does not have a severe impairment in his upper extremities. This same argument is asserted in Plaintiff's fourth point, and the Court discusses it there. *See infra* p. 23-24.

Third, Plaintiff contends that the ALJ erred by characterizing his asthma as mild and intermittent. This argument is unavailing. There is substantial evidence in the record to support a finding of Plaintiff's asthma as non-severe. Treatment notes indicate the asthma was well controlled (R. 1081), that the symptoms were mild (R. 1083), and that it was recommended that Plaintiff step down his asthma medication (*Id.*).

Fourth, Plaintiff argues that the ALJ erred in stating that his headaches were controlled by medication. Again, there is substantial evidence in the record to support the ALJ's finding in this regard. *See* R. 706 (headaches responded well to propranolol); R. 37 (Plaintiff's testimony that medication was effective in treating his headaches).

In addition, Plaintiff has failed to show how any factual errors allegedly made by the ALJ prejudiced him. *See Schneider v. Colvin*, No. 3:13-CV-00790 MPS, 2014 WL 4269083, at *8 (D. Conn. Aug. 29, 2014) (a plaintiff must identify how he was prejudiced by any mischaracterization by the ALJ of his severe impairment).

The Court finds that substantial evidence supports the ALJ's decision and that Plaintiff received a full and fair hearing.

### 3. The "Treating Physician Rule"

Plaintiff next claims that the ALJ failed to afford proper weight to the opinions of Dr. Ahmed and therapist Brian Cardona.  In support of this argument, Plaintiff relies on the "treating physician rule."

Under the "treating physician rule," a treating physician's opinion on the issues of the nature and severity of a claimant's impairments is given "controlling weight" if the opinion is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with other substantial evidence in the case record.  20 C.F.R. §§ 404.1527(c)(2), 416.927(c)(2); *see also Green-Younger v. Barnhart*, 335 F.3d 99, 106 (2d Cir. 2003).  The opinion of a treating source is accorded extra weight because of the continuity of the treatment that he or she provides, and the doctor-patient relationship, which places him or her in a unique position to make a complete and accurate diagnosis of the patient.  *Mongeur v. Heckler,* 722 F.2d 1033, 1039 n. 2 (2d Cir. 1983).  However, the opinion of a treating source will not be afforded controlling weight if that opinion is not consistent with other substantial evidence in the record, including the opinions of other medical experts.  *Halloran v. Barnhart*, 362 F.3d 28, 32 (2d Cir. 2004); 20 C.F.R. §§ 404.1527(c)(2), 416.927(c)(2).  "[T]he less consistent th[e] opinion is with the record as a whole, the less weight it will be given."  *Snell v. Apfel*, 177 F.3d 128, 133 (2d Cir. 1999).

Even when a treating physician's opinion is not given "controlling" weight, the regulations require the ALJ to consider several factors in determining how much weight it should receive.  *Halloran*, 362 F.3d at 32.  Those factors include the length of the treatment relationship;

the nature and extent of the treatment relationship; the supportability of the treating physician's opinion particularly by medical signs and laboratory findings; its consistency with the record as a whole; the physician's area of specialty; and other factors brought to the attention of the Social Security Administration that tend to support or contradict the opinion. *Id.*; 20 C.F.R. §§ 404.1527(c)(2), 416.927(c)(2). After considering these factors, the ALJ must comprehensively set forth his reasons for the weight assigned to a treating physician's opinion. SSR 96-2P, 1996 WL 374188, at *5 (S.S.A. July 2, 1996). Failure to provide good reasons for not crediting the opinion of a claimant's treating physician is a ground for remand. *Sanders v. Comm'r of Soc. Sec.*, 506 Fed.App'x 74, 77 (2d Cir. 2012); *Burgess v. Astrue*, 537 F.3d 117, 129 (2d Cir. 2008); *Snell*, 177 F.3d at 133.

Here, Plaintiff argues that the ALJ erred in dismissing the opinions of Plaintiff's treatment providers at Inter, Dr. Ahmed and Mr. Cardona, that Plaintiff has physical and mental functional limitations that preclude work.

The Court finds that the ALJ provided sufficient reasons for not fully crediting the opinions of Dr. Ahmed and Mr. Cardona. The ALJ asserted that the RFC questionnaires completed by Dr. Ahmed and Mr. Cardona in which they opine that Plaintiff has serious and very serious limitations were not supported by the treatment notes. There is substantial evidence in Inter records that conflicts with the opinions of Dr. Ahmed and Mr. Cardona as to the severity of Plaintiff's limitations. For example, on January 13, 2009, Dr. Ahmed's notes indicate that Plaintiff's medication was effective and his mood swings were decreased. (R. 482). An Inter service plan from June 10, 2010 states that Plaintiff's depression and anxiety were improved. (R. 532). Treatment notes from May 8, 2012 state that Plaintiff was periodically working through a temp agency, was looking for work, was attending church several times per week, and that

medication was beneficial in controlling negative emotions.  (R. 1176).  Finally, treatment notes

from August 31, 2012 indicate that Plaintiff found a stable job, continued to attend church

services several times per week, and that medication helped in controlling his emotions.  (R.

1180).

A treating source's opinion will be given controlling weight when it is consistent with

other medical evidence.  "When other substantial evidence in the record conflicts with the

treating physician's opinion, however, that opinion will not be deemed controlling."  *Snell*, 177

F.3d at 133.  The Court finds no error with the ALJ's determination that the opinions of Dr.

Ahmed and Mr. Cardona were not entitled to controlling weight[2].  *See Jones-Reid v. Astrue*, 934

F. Supp.2d 381, 400 (D. Conn. 2012) *aff'd*, 515 Fed. App'x 32 (2d Cir. 2013) (treating source's

opinion not entitled to controlling weight when not well-supported); *Sidowski v. Astrue*, No.

3:10-CV-00243 VLB, 2010 WL 5562080, at *9 (D. Conn. Dec. 7, 2010) (treating source's

opinion not entitled to controlling weight when it was inconsistent with opinions of other

experts, including non-examining sources).

### 4. Severe Impairments

The ALJ found, at step two of the sequential evaluation process, that Plaintiff had the

following severe impairments: affective disorder, anxiety disorder, migraine headaches, and

asthma.  (R. 12).  Plaintiff claims that the ALJ erred in not evaluating and finding as severe

Plaintiff's carpal tunnel syndrome, osteoarthritis, traumatic brain injury, PTSD, and GERD.

---

2       To the extent Plaintiff argues that the ALJ erred in the weight he accorded to non-
examining sources, the Court rejects this argument.  Where the opinion of the treating physician
is inconsistent with other substantial evidence in the record and, therefore, not entitled to
controlling weight, an opinion of a non-examining doctor that is consistent with substantial
evidence in the record may be afforded controlling weight.  *See Cyr v. Astrue*, No. 3:10-CV-
1032 CFD TPS, 2011 WL 3652493, at *11 (D. Conn. Aug. 19, 2011).

At the second step of the disability evaluation process, the ALJ must determine whether the claimant has a medically determinable impairment that is "severe" or a combination of impairments that is "severe."  20 C.F.R. § 1520(c); 20 C.F.R. § 416.920(c).  At this step, medical evidence alone is considered in assessing the effect of the impairment or impairments on an individual's ability to do basic work activities.  SSR 85–28 (S.S.A. 1985).

The regulations provide that the ALJ is to consider the combined effects of all of a claimant's impairments without regard to whether any one impairment, if considered separately, would be of sufficient severity to be the basis of eligibility under the law.  *See* 20 C.F.R. § 404.1523; 20 C.F.R. § 416.923.  If the claimant is found to have a medically severe combination of impairments, the combined impact of those impairments will be considered throughout the disability determination process.  *Id.*  An impairment or combination of impairments is considered "not severe" and a finding of "not disabled" is made at this step when the medical evidence establishes only a slight abnormality or a combination of slight abnormalities which would have no more than a minimal effect on an individual's ability to work.  SSR 85–28.  When a claimant fails to "furnish the ALJ with any medical evidence showing how these alleged impairments limited his ability to work," the argument that the ALJ should have found an impairment severe is "without merit."  *Britt v. Astrue*, 486 Fed.App'x 161, 163 (2d Cir. 2012).

Plaintiff first argues that the ALJ did not discuss his carpal tunnel syndrome, osteoarthritis, traumatic brain injury, PTSD, and GERD and any symptoms or limitations these impairments cause.  In support of this argument, Plaintiff provides a list of record citations.  These citations are merely to where the impairment is *mentioned* in the record.  None of the citations Plaintiff provides are actually evidence of the impairment's *impact* on Plaintiff's ability to perform work-related activity.  When there is no evidence a particular impairment results in a

functional limitation, the ALJ need not discuss it explicitly.  *See Cozeolino v. Colvin*, No. 11-CV-4530 DLI, 2013 WL 5533076, at *12 (E.D.N.Y. Sept. 30, 2013) (rejecting plaintiff's argument that the ALJ erred in failing to consider her obesity when medical records "mention Plaintiff's obesity, in passing, but do not suggest that her obesity contributes to the severity of her conditions or to her overall functional capacity."); *Schneider v. Colvin*, No. 3:13-CV-00790 MPS, 2014 WL 4269083, at *10 (D. Conn. Aug. 29, 2014) (finding plaintiff did not show that the ALJ erred in not assessing specifically how his RFC was impacted by the condition when he failed to point to any evidence that his condition was a medically determined impairment).  Here, there is evidence that the ALJ considered the entire record, even if he did not specifically mention each piece of evidence he reviewed.  *See Perez v. Colvin*, No. 3:13CV868 HBF, 2014 WL 4852836, at *17 (D. Conn. Apr. 17, 2014) *report and recommendation adopted*, No. 3:13-CV-868 JCH, 2014 WL 4852848 (D. Conn. Sept. 29, 2014) (finding no error when the ALJ did not specifically reference an impairment when there was sufficient evidence to determine the ALJ considered the records at issue).  As such, the Court rejects Plaintiff's argument that the ALJ erred by not specifically discussing certain impairments.

In addition, the ALJ did find some severe impairments and continued through the sequential process.  In so doing, "all impairments, whether severe or not, were considered as part of the remaining steps.  This result fits within the Second Circuit's description of step two as a screen for claimants with less than de minimis impairments."  *Perez* at *17.  As such, "the ALJ's failure to specifically determine whether each of plaintiff's claimed impairments was severe is harmless error, and would not support a reversal of the Commissioner's decision."  *Id.*

As to Plaintiff's arguments that his carpal tunnel syndrome, osteoarthritis, traumatic brain injury, PTSD, and GERD *are* severe impairments, the Court finds no evidence to support such a

position.  Again, the citations Plaintiff provides are to records wherein an impairment is either

diagnosed or simply listed in Plaintiff's medical history.  Plaintiff's diagnoses and past history of

these conditions, alone, are not sufficient to support a finding of severity.  *See Burrows v.*

*Barnhart*, 2007 WL 708627, at *6 (a diagnoses of an impairment "says nothing about the

severity of the condition") (citation omitted); *Ortiz v. Colvin*, No. 3:13 CV 610 (JGM), 2014 WL

819960, at *10 (D. Conn. Mar. 3, 2014) (finding no error in ALJ's finding of non-severity when

claimant received treatment for headaches but neurological testing was normal).

In all, the Court finds that the ALJ properly considered Plaintiff's impairments, alone and

in combination, and did not err in determining that Plaintiff's carpal tunnel syndrome,

osteoarthritis, traumatic brain injury, PTSD, and GERD were non-severe.

### 5. Listed Impairments

Plaintiff additionally claims that his PTSD meets Listing 12.06 and the ALJ's conclusion

it does not is not supported by substantial evidence.  To meet the requirements of Listing 12.06,

Plaintiff must show medically documented evidence of:

> A(5): Recurrent and intrusive recollections of a traumatic experience, which are a
> source of marked distress, resulting in
> B: at least two of the following: (1) Marked restriction of activities of daily living;
> or (2) Marked difficulties in maintaining social functioning; or (3) Marked
> difficulties in maintaining concentration, persistence, or pace; or (4) Repeated
> episodes of decompensation, each of extended duration.
> Or
> C: complete inability to function independently outside the area of one's home.

20 C.F.R. Pt. 404, Subpt. P, App. 1 § 12.06.

The burden of proof is on the Plaintiff to present evidence he satisfies all of the Listing

requirements.  *See Ruiz v. Apfel*, 26 F.Supp.2d 357, 367 (D. Conn. 1998).  "For a claimant to

show that [an] impairment matches a listing, it must meet *all* of the specified medical criteria."

*Sullivan v. Zebley*, 493 U.S. 521, 530 (1990).  Here, Plaintiff fails to cite any evidence in the

record establishing he meets the *particular requirements* of Listing 12.06.  *See McShea v. Colvin*, No. 11-1132-AVC, slip op. 9 (D. Conn. Sept. 20, 2014) (holding that the ALJ did not err in finding claimant failed to meet a listing when Plaintiff's assertion that she did met the listing was "hollow without medically documented evidence").

Beyond this, there is substantial evidence to support the ALJ's determination that Plaintiff's PTSD did not meet Listing 12.06.  The ALJ specifically discussed how the record evidence does not satisfy the paragraph B criteria.  He found that Plaintiff has "mild restrictions" in activities of daily living, "moderate difficulties" in social functioning, "moderate difficulties" in maintaining concentration, persistence, or pace, and no episodes of decomposition of extended duration[3].  (R. 14).  The ALJ supported these findings with evidence from the record, including Plaintiff's testimony about his work at Wendy's, his interactions with his mangers there, and the tasks he completes while at work.  (*Id.*).  *See McCartney v. Apfel*, 28 Fed.Appx. 277, 280 (4th Cir. 2002) (evidence that claimant "functioned adequately in work settings at a managerial level" supported ALJ's conclusion that claimant did not satisfy Listing 12.06(5)).  The ALJ also clearly considered the paragraph C criteria.  (R. 14-15).

Medical evidence in the record supports these findings as well.  Several state medical experts specifically considered Listing 12.06 and determined that Plaintiff's impairment did not satisfy the Listing criteria.  (R. 89-90, 1011).  In all, the Court finds that the ALJ did not make any legal error and that his decision that Plaintiff did not have a listing impairment was supported by substantial evidence.  *See Morrow v. Astrue*, No. 8:09-cv-0992 (LEK/GHL), 2010

---

[3]     While Mr. Cardona opines that Plaintiff had experienced three episodes of decomposition within a 12 month period, each of extended duration (R. 737), the ALJ explained that he gave this opinion little weight because the record does not document the three episodes of decomposition.  The Court finds no error in the weight afforded to Mr. Cardona's opinion.  *See supra* p. 19-21.

WL 3259988, at *6 (N.D.N.Y. July 30, 2010) (finding no error when ALJ "clearly discussed the paragraph B and C criteria, and supported his findings with substantial evidence.").

### 6. Plaintiff's Credibility

Next, Plaintiff claims that the ALJ failed to properly assess his credibility. Specifically, Plaintiff argues that the ALJ erroneously employed boilerplate language in assessing Plaintiff's credibility, and that the ALJ failed to properly evaluate Plaintiff's pain.

The boilerplate language objected to is as follows:

> After careful consideration of the evidence, the undersigned finds that the claimant's medically determinable impairments could reasonably be expected to cause the alleged symptoms; however, the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely credible for the reasons explained in this decision.

(R. 16).

It is the function of the Commissioner, not this Court, to appraise the credibility of the claimant. *Carroll v. Sec'y of Health & Human Servs.*, 705 F.2d 638, 642 (2d Cir. 1983). Here, had the ALJ only used this boilerplate paragraph, without more, it would have been error. *See Wages v. Comm'r of Social Security*, No. 3:11cv1571, 2013 WL 3243116, at *4 (D. Conn. June 26, 2013); *Halmers v. Colvin*, No. 3:12cv288, 2013 WL 5423688, at *7 (D. Conn. Sept. 26, 2013). However, the ALJ spent significant time explaining his credibility determination. He set forth the two-step process for considering a claimant's symptoms prescribed by the regulations. (R. 15). He reviewed, in detail, Plaintiff's testimony concerning his symptoms. (R. 15-16). He analyzed Plaintiff's medical treatment records, Plaintiff's response to treatment, the reports of the consultative examiners, and Plaintiff's testimony concerning his activities of daily living. (R. 16-21). The ALJ did more than merely use boilerplate language in explaining his credibility determination.

Plaintiff also claims that the ALJ failed to evaluate his pain, and did not make any specific findings concerning Plaintiff's pain.  The ALJ considered Plaintiff's testimony as to his mental limitations (*see* R. 16-19) and concluded that "claimant's level of activity is simply not consistent with disability."  When a claimant's statements as to the degree of limitation imposed by his impairments are inconsistent with other information in the record, the ALJ may properly give these statements "limited weight."  *Lumpkin v. Colvin*, No. 3:12CV1817 DJS, 2014 WL 4065651, at *10-11 (D. Conn. Aug. 13, 2014).  The ALJ also considered Plaintiff's testimony as to his headaches and asthma (*see* R. 19-20) and included appropriate limitations in his RFC assessment.  Plaintiff also asserts that his case should be remanded so that the ALJ can evaluate his lower back pain and carpal tunnel syndrome.  An ALJ need not mention every piece of evidence in the record.  "When, as here, the evidence of record permits us to glean the rationale of an ALJ's decision, we do not require that he have mentioned every item of testimony presented to him or have explained why he considered particular evidence unpersuasive or insufficient to lead him to a conclusion of disability."  *Mongeur v. Heckler*, 722 F.2d 1033, 1040 (2d Cir. 1983).

In all, the Court finds no error with the ALJ's credibility determination and finds it is supported by substantial evidence.  "Credibility findings of an ALJ are entitled to great deference and therefore can be reversed only if they are 'patently unreasonable.'"  *Pietrunti v. Dir., Office of Workers' Comp. Programs*, 119 F.3d 1035, 1042 (2d Cir. 1997) (quoting *Lennon v. Waterfront Transport,* 20 F.3d 658, 661 (5th Cir. 1994).  The Court finds no such unreasonableness here.

### 7. Plaintiff's RFC

Plaintiff additionally argues the ALJ failed to properly determine his RFC because he gave no basis for the RFC description as required by the Remand Order and failed to include in

the RFC description limitations such as Plaintiff's headaches, carpal tunnel syndrome, and

osteoarthritis.  The Court notes the RFC description does take into account Plaintiff's headaches:

"The effect of the claimant's migraines on his functioning has been considered in the limitations

of simple, routine repetitive tasks with short simple instructions and few workplace changes; an

attention span to perform simple work tasks for 2-hour intervals throughout an 8-hour workday;

no high-paced production demands or strict adherence to rimed production."  (R. 20).  As to

carpal tunnel and osteoarthritis, the Court has explained that there is no evidence of functional

limitations caused by these impairments. *See supra* p. 22-24.

　　　　Plaintiff further argues that the jobs the Vocational Expert testified Plaintiff can perform

fall into the reasoning level 2 category (automobile detailer, hand packager, production worker,

production inspector), but that the assessed RFC, which limits Plaintiff to "simple instructions,"

would apply only to reasoning level 1 jobs.  The Dictionary of Occupational Titles "(DOT")

defines the reasoning levels.  Relevant here is as follows: "R1: Apply commonsense

understanding to carry out simple one- or two-step instructions…; R2: Apply commonsense

understanding to carry out detailed but uninvolved written or oral instructions …"  *Lovell v.*

*Astrue*, No. 2:12-CV-128, 2013 WL 174886, at *8 (D. Vt. Jan. 16, 2013) (citing U.S. Dep't of

Labor, *Dictionary of Occupational Titles*, 1991 WL 688702 (4th ed.1991)).  A limitation to work

with simple instructions is consistent with jobs in reasoning levels 1 *and* 2.  *See Jones-Reid*, 934

F.Supp.2d at 409 (finding that a limitation to "only short, simple instructions" is "not

inconsistent with" jobs requiring reasoning levels 2 or 3).  There is no error.

### 8. Defendant's Burden at Step Five

　　　　Finally, Plaintiff argues that the Commissioner did not carry her burden at step five of

showing that there are jobs that exist in significant numbers in the national economy that

Plaintiff could perform.  In support of this position, Plaintiff repeats his argument that the representative jobs that the Vocational Expert identified that a hypothetical individual with Plaintiff's RFC could perform exceeded the RFC set forth by the ALJ.  The Court has already rejected this position.  *See supra* p. 28.  The Court finds no error in the ALJ's step five finding.

## Conclusion

After a thorough review of the administrative record and consideration of all of the arguments raised by Plaintiff, the Court concludes that the ALJ did not commit any legal errors and that his decision is supported by substantial evidence.  Accordingly, the Court recommends that Defendant's Motion to Affirm the Decision of the Commissioner [Doc. #20] should be GRANTED and that Plaintiff's Motion to Reverse [Doc. # 15] should be DENIED.

This is a Recommended Ruling.  *See* Fed. R. Civ. P. 72(b)(1).  Any objection to this Recommended Ruling must be filed within 14 days after service.  *See* Fed. R. Civ. P. 72(b)(2). In accordance with the Standing Order of Referral for Appeals of Social Security Administration Decisions dated September 30, 2011, the Clerk is directed to transfer this case to a District Judge for review of the Recommended Ruling and any objections thereto, and acceptance, rejection, or modification of the Recommended Ruling in whole or in part.  *See* Fed. R. Civ. P. 72(b)(3) and D. Conn. Local  Rule 72.1(C)(1) for Magistrate Judges.

SO ORDERED, this  __3rd___ day of March, 2015, at Bridgeport, Connecticut.

 */s/ William I. Garfinkel*
WILLIAM I. GARFINKEL
United States Magistrate Judge